" This case, however, is not exactly of that character, but still more strong against the complainants; the splitting of the account being with the knowledge and at the instance of Predeaux, for the purpose of giving jurisdiction to the magistrates, of which the other complainants, his superseders, had full knowledge. "

"There is, therefore, admitting that the parties could not by splitting the account give jurisdiction to the magistrate, not only no ground for the interposition of a court of chancery, but no justice or honesty in their pretensions— and he who seeks relief in equity must come into chancery with clean hands.

"And however irregular the placing the executions in the hands of Derickson the original plaintiff, and the levying of those executions by him, may have been, it was a matter cognizable in a court of law, to which recourse might have been had, and in which such irregularities are properly to be corrected. And this is not of that class of cases in which courts of law and equity have concurrent jurisdiction."

---

# WASHINGTON WATERS *vs.* LYDE GRIFFITH, Ex'er of LYDE GRIFFITH, deceased.

In an agreement between G. and W., it was stipulated, "that the said G. agrees and obliges himself to let W. have the privilege to *dig for, get and remove* chrome ore or mineral from his land," &c.; and "also, that the said W. shall pay unto the said G. the sum of five dollars for each and every ton of ore *he may obtain and remove from said land.*" HELD,

That under this agreement, before W. could be charged for the ore which he designed to purchase, it must not only be excavated from the earth, but actually removed from the land.

Some distinct meaning must, if possible, be given to every word in the contract, and the word "*obtain*," being sufficient to embrace all the ore that may be excavated and thrown out upon the surface, without the aid of the words, "*remove from said land*," the latter words must mean, that the ore should be actually removed from the premises before W. can be charged with it.

APPEAL from Montgomery county court.

This was an action of *covenant* by the appellee against the appellant, upon the agreement set out in full below in the opinion of this court. The breaches of the covenant alleged in the declaration were:—1st. That the defendant "did dig for, get and remove" chrome ore from the land of Lyde Griffith in his lifetime, it being the land formerly occupied by Benjamin King, and mentioned in the articles of agreement, and did not pay to the said Lyde Griffith in his lifetime, or to the plaintiff, his executor, "five dollars per ton for each and every ton of chrome ore or mineral dug, gotten and removed" by defendant, according to the form and effect of the articles of agreement. 2nd. That defendant, after digging and getting twenty thousand tons of chrome ore, did fail to sell and dispose of the same and to pay five dollars for each ton thereof. The defendant pleaded that he had paid to the plaintiff the sum of $5 for each and every ton of the chrome ore or mineral which "he had removed from the said land," and on this plea issue was joined.

*1st. Exception.* The plaintiff offered in evidence the agreement referred to, and then offered to prove, that there was lying at the mines on the land referred to, about three hundred tons of chrome ore or mineral, dug and thrown out of said mines by defendant, under said contract, and lying on the margin thereof, but not carried away from the land. The defendant objected to the admission of this evidence, but the court, (*Brewer*, A. J.,) overruled the objection, and permitted the evidence to go to the jury, and the defendant excepted.

*2nd. Exception.* The defendant then offered in evidence the following receipt: "1838, January 30th, Received of Washington Waters, $50 in full, for the entire right to search for, dig, and remove, as he may think proper, chrome ore or mineral from the lot of ground marked out for him, upon the terms specified in a contract between him and myself, dated, October 18th 1837. Also for the use of the house, except the cellar, in said lot, so long as he may wish it, for the use

of the hands he may employ in digging for chrome upon said lot." Signed, "Lyde Griffith, Washington Waters." The plaintiff then on his part offered the following letter of the defendant. "Dear Sir,—I received a letter this morning from yourself and Mr. Tyson, per one of his hands, requesting me to go over to your house, which request I would willingly comply with would my engagements permit, but situated as I am to-day, and supposing there can be no urgent business with you I must decline, but will go over the first opportunity I shall have. The object of Mr. Tyson's visit to you, I suppose must be to make a contract with you for chrome, but as I have already made a contract with you I hope you will make no contract with him which will in any manner interfere with the one I have made with you, or that you will decline making any with Mr. Tyson until I shall see you.

In haste, yours, &c.,

*January* 16*th,* 1838.          WASHINGTON WATERS."

: The plaintiff then asked the court to instruct the jury, that if they believe from the evidence that defendant entered upon the lands of Lyde Griffith, deceased, under the contracts proved to have been made between the said Griffith and defendant, one dated the 18th of October 1837, and the other the 30th of January 1838, and dug for, found and removed chrome or minerals from the land mentioned in said contracts then the plaintiff is entitled to recover $5 for each and every ton of chrome ore or mineral the plaintiff has proved to have been taken out of the mines by defendant, whether the same has been carried away from the land or whether the same now remains on the surface of the earth near the mines. The court granted this instruction, and the defendant excepted. The jury rendered their verdict, that the defendant had not observed, performed, fulfilled or kept the covenants in the articles of agreement mentioned, and assessed the damages at $2056.25. Upon this verdict the court rendered judgment for the plaintiff, and the defendant appealed.

The cause was argued before LE-GRAND, C. J., ECCLESTON, MASON and TUCK, J.

*Alexander* for the appellant.   The issue in the case is, whether the defendant *removed* from the land any chrome ore for which he did not pay?   This is the plea, and the issue joined on it is the only one in the case.   The verdict does not follow the issue, and no judgment could be entered upon it.

The only parties who could sue for a breach of this contract after the death of the testator, were his heirs or devisees, and not his executor.   The plaintiff should therefore have proved the breach in the lifetime of the testator, which he has not done, for the evidence shows that the breach might have occurred after his death as well as before it.

Again, the evidence does not show there was any removal of the ore, but only that the defendant dug and threw out, and left on the land at the mouth of the mine, three hundred tons of the ore; it does not therefore prove the issue.

But the main question is upon the construction of this agreement.   It stipulates to give the defendant the privilege "to *dig, get and remove,*" and he binds himself to pay for such as is so "*obtained and removed,*" not for such as he dug and raised to the mouth of the mine.   If the understanding was, that he was to pay for such as he *dug*, he would have said so in the agreement, and not have used the words "*get and remove.*"   The *removal* was to precede the obligation to pay, and for these reasons the court erred in admitting the evidence in the 1st exception.

*2nd Exception.*   Here there is a new agreement.   The receipt of the 30th of January 1838, is *in full*, and the effect of it is to annul the first agreement entirely.   No prayer could have been predicated upon the subject of this second contract. There was no allegation of the breach of this contract in the declaration.   But again, if we look alone to this second contract we find no stipulation to pay $5 for the ore—the words "entire privilege" supersede all reference to the terms of the former agreement relating to the payment of the $5 per ton, and this second agreement only incorporates the other stipulations of the first agreement.

42      v.2

There is a further defect in the evidence. It does not show that there was any merchantable ore dug from the mines.

*Kilgour and Brewer* for the appellee.

The construction upon the agreement is to be upon the entire deed or agreement, and not merely upon disjointed or particular parts of it. The whole context shall be considered in endeavoring to collect the intention of the parties. See *Chitty on Contracts*, 83. *Story on Contracts*, 657. It is essential to consider the *subject matter* of the agreement in affixing a meaning to the terms used therein. *Chitty on Contracts*, 74, and the authorities there referred to; so in construing a contract the court will look to the *motives* that led to it, and the *object* intended to be effected by it. *Davis vs. Barney*, 2 *G. & J.*, 382. *Chitty on Contracts*, 74, *note* 2, and the authorities there referred to. Let us apply these principles to the agreement under consideration, in order to ascertain the true intent and meaning of the parties. The object intended to be effected was, that the defendant should mine and dig for chrome ore or mineral, upon the lands of plaintiff's testator, designated in the agreement, and remove it from the mines or pits when opened. The language employed is, "that defendant might dig for, get and remove from his land," &c. It being understood that plaintiff's testator should "not stop the defendant from mining." The business to be entered upon was mining, "and defendant undertook to pay $5 for each and every ton of ore he might obtain and remove from said land." From the whole context it is evident that the meaning of the parties was, that defendant should pay for all the chrome he might obtain and *remove* from the mines when opened, and that the words "obtain and remove from said land," are susceptible of no other construction.

But the defendant did *remove* three hundred tons of chrome from the *land* of plaintiff's testator. The chrome or mineral was deposited in the bowels of the earth. The defendant was compelled to open the mines to dig for it, and then to *remove* it from the earth or land where nature has embedded it.

When it was removed, by means of machinery or otherwise, from under the earth to the surface at the mouth of the mines, it amounted *literally* to a removal from the land of plaintiff's testator, and his right to $5 per ton for all thus removed was complete; and the defendant's omission or neglect to carry it away from the mines and sell it ought not to operate to the injury and prejudice of the testator. By its removal from the mines to the surface of the earth it became the property of the defendant, and he could maintain an action at law against any one who might take it away or interfere with it in any manner. The instruction given by the court below to the jury, contained in the second bill of exceptions, was therefore in harmony with the evident meaning and intention of the parties to the contract, and the evidence offered in the first bill of exception was properly admitted to the jury.

It is said, that there was no issue joined to which the instruction applied. If the construction given to the contract or agreement by the court below, and now insisted upon by us, be the true one, there was an issue joined to which the instruction applied.

It is contended by the appellant, that he was not bound to pay for the chrome he obtained and removed from the mines until he removed it from the land of the testator. If, then, the price of the article should fall in the foreign market, as was the case in this instance, and the chrome would not pay for the transportation, then the defendant might shelter himself from the payment of the price he contracted to give, under the plea that he had not removed it from the land. Surely this was not the meaning and intention of the parties.

The appellant contends, that the receipt dated January 30th, 1838, offered in evidence by the defendant, supports the construction placed upon the agreement by him. It is denied that it furnishes any such evidence.

By this paper the defendant *secured* the *absolute* and *entire* right to mine on the land mentioned, upon the *terms* specified in the contract, dated October 18th, 1837, (which is the basis of this suit,) and the *use* of *the house* on said lot, so long as

defendant might wish it, for the use of the hands he might employ in digging *for chrome* upon the said lot. The defendant gave $50 in *addition* to what he was to give under the contract of October 18th, 1837, for the *entire* right to dig on the ground mentioned, and the *use of the house* for his hands. The letter of defendant, dated January 16th, 1838, to plaintiff's testator, shows that Tyson was desirous to dig chrome in common with the defendant, upon the land marked out to him, and hence the execution of the paper of January 30th, 1838.

The construction given to the contract by the county court was in conformity to the plain meaning and import of the agreement, and the judgment ought to be affirmed. There was no other question than the construction of the agreement raised in the court below, and we decline replying to technical objections now for the first time raised to the pleadings by the appellant. See act 1823, ch. 117. 5 *Gill,* 306. 8 *Gill,* 306.

MASON, J., delivered the opinion of the court.

The present appeal will be settled by the construction which we place upon the covenant which constitutes the basis of this action. It is in these words, viz:

"Memorandum of agreement between Col. Lyde Griffith and Washington Waters, witnesseth: That the said Griffith agrees and obliges himself to let Washington Waters have the privilege to dig for, get and remove chrome ore or mineral from his land, formerly occupied by Benjamin King, it being understood by the parties, that the said Griffith shall not stop the said Waters from mining, or in any way interfere with his operations, so long as he may continue to follow the vein of chrome he may commence with, or continue to dig in the part of land marked out for him. Also, that the said Waters shall pay unto the said Griffith the sum of five dollars for each and every ton of ore he may obtain and remove from said land. In witness whereof we have hereunto set our

Waters *vs.* Griffith.

hands and seals, this 18th day of October, eighteen hundred
and thirty-seven:

LYDE GRIFFITH,          (Seal.)

WASHINGTON WATERS,          (Seal.)

Witness:—WALTER GRIFFITH."

We gather from the terms of this agreement the intention
of the parties to be, that before the defendant could be charg-
ed for the chrome ore, which he designed to purchase, it must
not only be excavated from the earth, but actually removed
from the premises of the plaintiff. Whatever ambiguity may
be supposed to exist as to the terms first employed, namely:
"dig for, get and remove chrome ore," &c., that ambiguity
is destroyed by the subsequent language in the agreement,
which provides, that the defendant shall pay five dollars for
each and every ton of ore "he may obtain and remove from
said land." We must give, if we can, some distinct mean-
ing to every word employed in the contract, and believing
that the word "*obtain*" is broad enough to embrace all the ore
that may have been excavated and thrown out upon the sur-
face, without the aid of the words "*removed from said land*,"
we must therefore assign to the latter terms some other office
or meaning. This we have no difficulty in doing, and do de-
clare, that the plain import of the language is, that the ore
should be actually *removed from the premises of the plaintiff*,
before the defendant can be charged with it.

This construction appears too, to be in perfect harmony
with reason and good sense. The defendant, when he en-
tered into the contract, must have looked to the purchase of
such ore as would be of use to him in his future operations,
and if the ore which was left upon the ground, and for which
the present suit seeks to make him answerable, was of such
a character, what possible motive could he have had in not ap-
propriating it to his own use?

Again, unless we are to assume that the value of the ore
was diminished by exposure to the action of the atmosphere, or
by some other agent, which is not at all probable, there is no
room for the plaintiff to complain, for if it was worth five

dollars a ton to him while in the bowels of the earth, (which we are to presume it was,) it was surely worth more after it had been dug and elevated, free of cost to him.  He gets the identical ore, which he had designed to sell to the defendant, actually enhanced to the extent of the cost necessary for its excavation and elevation to the surface.

The appellee's argument, that in the event of the price of the article falling in the market, the appellant might, under the view we have taken of the contract, shelter himself from responsibility, *by refusing to carry away the ore,* would apply with equal force to the contract as construed by himself.  As he regards it, the defendant would only have *to cease digging* to relieve himself from further liability, for it is not pretended that *all the ore* in the land of the appellee, or any specific portion of it, was sold, but only so much as was excavated.

We consider, therefore, as before stated, that the defendant was only chargeable for so much of the ore as he had removed from the appellee's land, and accordingly we reverse the court below upon the second exception.  The disposal of the point directly presented by this exception, renders any notice unnecessary of the other questions presented by the record or in argument, as in our opinion the case is concluded by what we have already said.

*Judgment reversed and procedendo awarded.*

TUCK, J., dissented.